UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DOMINIC NERVAL, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v.   ) | 1:20-cv-00122-JAW |
| ) | |
| STATE OF MAINE, ) | |
| ) | |
| Respondent ) | |

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION**

Petitioner, pursuant to 28 U.S.C. § 2254, seeks relief from a state court conviction and sentence. (Petition, ECF No. 1.) Petitioner argues the State withheld evidence favorable to Petitioner in violation of his due process rights, among other claims. (Petition at 10.) The State asks the Court to dismiss the petition. (Response, ECF No. 8.)

After a review of the section 2254 petition, the State's request for dismissal, and the record, I recommend the Court grant the State's request and dismiss the petition.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**A.    Arrest and Trial**

Petitioner was arrested on August 1, 2014, in the Auburn, Maine apartment of Jessica Goodwin. (*State v. Nerval*, Me. Super. Ct., AUBSC-CR-2014-00789, Trial Transcript at 119–23.) In October 2014, Petitioner was indicted on two counts of aggravated drug trafficking. (*State v. Nerval*, Me. Super. Ct., AUBSC-CR-2014-00789, Docket Record at 2.) A jury trial was held in March 2016. (*Id.* at 7.) Petitioner's attorney

made several requests for all the physical evidence in the case shortly after his arrest and several days before trial.

At trial, Maine DEA Agent Nicholas Gagnon testified that he had received information from a member of a drug treatment court suggesting that drug trafficking was occurring in Jennifer Goodwin's apartment. (Trial Transcript Vol. I at 104–05.) On July 29, 2014, Agent Gagnon went to the apartment to investigate. (*Id.* at 105.) According to Agent Gagnon, Ms. Goodwin—after deciding to cooperate to avoid a penalty at drug court—admitted to drug dealing, showed Agent Gagnon text messages she had sent to customers, and told Agent Gagnon the drugs came from someone named DJ. (*Id.* at 105–06, 110–11.) Agent Gagnon also explained that Ms. Goodwin made a phone call to DJ, which call Agent Gagnon monitored, and DJ implied that he would be back on August 1 with more drugs. (*Id.*) On August 1, Ms. Goodwin informed Agent Gagnon that DJ had returned with additional drugs and gave Agent Gagnon permission to enter and search the apartment. (*Id.* at 81.)

Agent Gagnon and two other agents knocked on the apartment door, and Petitioner opened the door. (*Id.* at 36–37.) According to two of the agents, Petitioner appeared to step backward or to turn to flee into the apartment; Petitioner and the first agent through the door fell down on the floor, perhaps tripping over a step just behind the entryway. (*Id.* at 37–38, 121–24.) The agents handcuffed Petitioner and patted him down, finding $2,000 in cash. (*Id.* at 38–39.)

The agents seated Petitioner at the kitchen table and read him his Miranda rights. (*Id.* at 39–43; 123–26.)   Agent Gagnon searched the apartment and periodically

2

interviewed Petitioner, describing his own tone and Petitioner's demeanor as calm and conversational. (*Id.*) An agent purchased breakfast sandwiches and beverages from a nearby store for everyone, including Petitioner. (*Id.*) Above the ceiling tiles in the bathroom, Agent Gagnon found approximately 200 pills and two bags of white powder. (*Id.* at 46–47.) Agent Gagnon testified that Petitioner admitted to obtaining drugs in Massachusetts and selling them in Maine. (*Id.* at 46–47, 54–60, 100–03.) When asked on cross-examination if he collected Petitioner's cell phone, Agent Gagnon said he believed he did but that he did not apply for a search warrant to access its content. (*Id.* at 70–79.)

Petitioner testified at trial and characterized the encounter differently than Agent Gagnon. Petitioner said the encounter was traumatic, that he was "scared the whole time," that the first agent through the door pressed a gun directly against Petitioner's head as they fell, and that the agents strip searched him. (Trial Transcript Vol. II at 65–68, 72.) According to Petitioner, the agents did not inform him of his Miranda rights and denied his explicit requests for a lawyer; he said never confessed to the crime. (*Id.* at 70–76.)

At the conclusion of the trial in March 2016, the jury found Petitioner guilty on both counts. (Docket Record at 7–8.)

**B.     Motion for New Trial**

Approximately two weeks after the trial, citing *Brady v. Maryland*, 373 U.S. 83 (1963), Petitioner requested a new trial because the defense had gained access to Petitioner's iPhone seized by law enforcement and learned that the call log did not contain a record of a call from Ms. Goodwin's phone number on July 29, 2014, the date that Agent Gagnon testified that he monitored a call from Ms. Goodwin to her supplier, DJ. (Motion

for a New Trial, ECF No. 11 at 2-4; Amended Motion for a New Trial, ECF No. 11 at 5–7.) The trial court held an evidentiary hearing in July 2016. (Docket Record at 9–10.)

At the hearing, Ms. Goodwin testified about her only mobile phone number in 2014, which did not appear on the July 29, 2014 call log exhibit that Petitioner introduced from the seized iPhone. (New Trial Hearing Transcript at 6–9, ECF No. 11 at 10–75.) She denied that Petitioner had given her another number to call, but she identified Petitioner as the individual she referred to as DJ. (*Id.* at 10–11.) Ms. Goodwin also testified that Petitioner would bring drugs with him when he came to Maine and that she and Petitioner sold pills and cocaine together. (*Id.* at 12–13.) Petitioner testified that he only had one mobile phone, and he agreed to give a computer expert his passcode to prove there were no phone calls between him and Ms. Goodwin on July 29th, 2014. (*Id.* at 17–21.) Petitioner denied that he sold drugs. (*Id.* at 20.)

Agent Gagnon testified that drug dealers commonly use two mobile phones. (*Id.* at 27.) He admitted that he did not note in his police reports or logs that he had collected Petitioner's phone, and he admitted that although he delivered drug evidence to the prosecutor's office when asked to produce the physical evidence before trial in response to Petitioner's request, he did not present a cell phone at that time. (*Id.* at 28–32.) Agent Gagnon explained why he did not log the passcode-protected iPhone in the evidence tracking system:

> Since I've been at Maine Drug Enforcement nobody has been able to come up with a clear cut way that we should handle cell phones and Lithium batteries and such, because evidence gets stored at a central facility, and with the amount of phones that get taken from investigations, there hasn't been a clear cut where we should put phones. So I know that it's been practice in

4

> my office that if you take a cell phone on a case, if you're going to do a search warrant on it, you log it into the tracker. If you're not going to do a search warrant on it based on things like we can't get into it because of a password, then we return it to the owner.

(*Id.* at 33–34.) He said he typically gets a call from a suspect asking for property to be returned, but he did not receive such a request in this case until after trial. (*Id.* at 34–35.)

Agent Gagnon testified that he had collected two mobile phones from the apartment on the day of Petitioner's arrest, an iPhone and a cheaper model. (*Id.* at 47–48.) Because both phones required passwords to access their contents, Agent Gagnon did not believe they would be of evidentiary value, so he placed them in a yellow envelope labeled with Petitioner's name and "return to owner" and put the envelope in his locker. (*Id.* at 49–50.) Agent Gagnon said he brought both phones to be examined when requested after trial, but Petitioner's consultant only examined the iPhone because Petitioner claimed the other phone did not belong to him. (*Id.* at 52–53.) He said drug dealers often use a cheaper phone and frequently switch those numbers, so he would not have expected to see anything incriminating on the iPhone. (*Id.* at 48–49.)

The state trial court concluded that "under the most charitable interpretation", the evidence could be considered favorable to Petitioner and was "at most inadvertently suppressed by the State." (Order on Motion for New Trial at 3, ECF No. 11 at 97–100.) The state court denied the motion for a new trial because it determined the evidence was not material as there was no reasonable probability of a different result even if Defendant had introduced the iPhone call history. (*Id.* at 4.) The state court noted the differences between Petitioner's version of the arrest and interview and Agent Gagnon's version,

including the confession, the Miranda warnings, and the strip search and concluded that "[t]he jury found the agent's version of the interview more compelling, as did the court." (*Id.*)

In December 2016, Petitioner was sentenced to fourteen years imprisonment with all but seven years suspended, to be followed by three years of probation. (Docket Record at 11).

### C.     Appeal and Postconviction Proceedings

Petitioner appealed; in October 2017, the Maine Supreme Judicial Court affirmed. (*State v. Nerval*, Me. L. Ct., AND-17-13, Memorandum Decision.) Regarding Petitioner's *Brady* claim, the Supreme Judicial Court held:

> The court also properly denied [Petitioner's] motion for a new trial because he failed to prove that there was a reasonable probability that the introduction of his iPhone into evidence at trial would have produced a different verdict. *See State v. Twardus*, 2013 ME 74, ¶ 32, 72 A.3d 523.

*Id.* at 1.   The sentencing review panel of the Supreme Judicial Court also upheld Petitioner's sentence.  (*State v. Nerval*, Me. L. Ct., SRP-17-14, Order Denying Leave to Appeal.)

In January 2018, Petitioner filed a postconviction petition in state court. (*State v. Nerval*, Me. Super. Ct., ANDCD-CR-2018-00246, Docket Record at 1.) In November 2019, Petitioner voluntary withdrew his postconviction petition in consideration for being resentenced with his term of imprisonment reduced by six months. (*Id.* at 3; Postconviction Hearing Transcript at 2–5.)

6

Petitioner filed his federal petition in the District of Massachusetts in February 2020, and the matter was transferred to the District of Maine in April 2020. (Petition, ECF No. 1; Transfer Order, ECF No. 4.)

## DISCUSSION

**A.  Legal Standards**

Pursuant to 28 U.S.C. § 2254(a), a person in custody pursuant to the judgment of a state court may apply to a federal district court for writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

Absent circumstances not relevant to Petitioner's case, a petitioner is required to exhaust available state court remedies before he seeks federal habeas review. 28 U.S.C. § 2254(b), (c).[1] "Before seeking a federal writ of habeas corpus, a state prisoner must

---

[1] Title 28 U.S.C. § 2254(b) and (c) address exhaustion and state:

> **(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
> **(A)** the applicant has exhausted the remedies available in the courts of the State; or
>
> **(B) (i)** there is an absence of available State corrective process; or
>
> **(ii)** circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> **(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
>
> **(3)** A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese,* 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry,* 513 U.S. 364, 365 (1995) (per curiam)) (quotation marks omitted). In *Baldwin,* the Court noted that "[t]o provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (quoting *Duncan,* 513 U.S. at 365–66).

To exhaust a claim fully in state court in Maine, a petitioner must request discretionary review by the Law Court. *See* 15 M.R.S. § 2131. The Supreme Court has held that a procedural default bars federal review absent a demonstration of cause for the default and prejudice to the petitioner:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).[2]

---

**(c)** An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

[2] Procedural default is a judicial doctrine "related to the statutory requirement that a habeas petitioner must exhaust any available state-court remedies before bringing a federal petition." *Lovins v. Parker,* 712 F.3d 283, 294 (6th Cir. 2013) (citing 28 U.S.C. § 2254(b), (c)).

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court recognized a "narrow exception" to its holding in *Coleman*, based on equity, not constitutional law: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9, 16. However, when the procedural default relates to post-conviction counsel's actions at the discretionary-review stage rather than at the initial-review stage of the collateral proceedings, habeas relief is not available:

> The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial . . . .

*Martinez*, 566 U.S. at 16 (citations omitted).

As to federal habeas claims that were adjudicated on the merits in state court, the federal court may not grant relief unless (1) the state court decision was contrary to, or an unreasonable application of, federal law, as determined by the Supreme Court, pursuant to 28 U.S.C. § 2254(d)(1); or (2) the decision was based on an unreasonable determination of the facts, pursuant to section 2254(d)(2).[3]

---

[3] Title 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim−
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

As to review of a state court decision under section 2254(d)(1), "[i]t is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" *Nevada v. Jackson,* 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington v. Richter,* 562 U.S. 86, 102 (2011)). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the [*Strickland v. Washington*, 466 U.S. 668 (1984)] standard itself." *Harrington*, 562 U.S. at 101. Claims of ineffective assistance of counsel are thus subject to a "'doubly deferential'" standard of review, in deference to both the state court and defense counsel. *Woods v. Etherton,* --- U.S. ---, ---, 136 S. Ct. 1149, 1151 (2016) (per curiam) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). State court determinations of fact "shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[4]

---

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[4] The decision under review in this case is the Law Court's order affirming the decision of the trial court, because the Law Court's decision is the final state court adjudication on the merits of each claim. *See Greene v. Fisher*, 565 U.S. 34, 40 (2011) (noting that the last state-court adjudication on the merits of the petitioner's constitutional claim occurred on direct appeal to the state's supreme court); *Clements v. Clark*, 592 F.3d 45, 52 (1st Cir. 2010) ("A matter is 'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground.'") (quoting *Teti v. Bender*, 507 F.3d 50, 56-57 (1st Cir. 2007)).

However, because the Law Court's order did not clearly explain the Court's reasoning, the federal court may consider the trial court's decision:

    We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

In *Strickland*, the Supreme Court set forth the relevant Sixth Amendment standard by which claims of ineffective assistance based on counsel's errors are evaluated on the merits; *Strickland* requires a petitioner to demonstrate that "counsel's representation fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 688, 694. A court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. A court presumes "that counsel has 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Companonio v. O'Brien*, 672 F.3d 101, 110 (1st Cir. 2012) (quoting *Strickland*, 466 U.S. at 690).

A court considers "the totality of the evidence," and "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696.

**B.    Exhaustion and Waiver**

The State argues that Petitioner defaulted all of his claims except the *Brady* claim because he voluntarily withdrew his state postconviction petition. A petitioner must exhaust the available state court remedies by fairly presenting all federal claims "in each

---

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (noting the state may rebut the presumption).

appropriate state court (including a state supreme court with powers of discretionary review)" before pursuing federal habeas relief. *Baldwin v. Reese,* 541 U.S. 27, 29 (2004). Petitioner failed to exhaust the available state court remedies because he voluntarily withdrew his petition, depriving the postconviction court and the Maine Law Court from ruling on the merits of his federal claims.

Because the state court would now find the unexhausted claims (i.e., the claims Petitioner withdrew) to be procedurally barred, Petitioner procedurally defaulted those claims for purposes of federal habeas relief. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) ("there is a procedural default for purposes of federal habeas" review if "the court to which the petitioner would be required to present his claim in order to meet the exhaustion requirement would now find the claims procedurally barred"). Petitioner has not established anything that would constitute cause to excuse the procedural default or actual innocence of the crime.

Furthermore, because Petitioner voluntarily withdrew his petition and was resentenced according to an arrangement he made with the State, he arguably waived his asserted claims. *Cf. United States v. Rodriguez*, 311 F.3d 435, 437 (1st Cir. 2002) (a party waives a right or issue "when he intentionally relinquishes or abandons it" and forfeits a right or issue by failing to timely assert it; "a waived issue ordinarily cannot be resurrected on appeal, whereas a forfeited issue may be reviewed for plain error") (citations omitted). In addition, to the extent Petitioner seeks relief based on the original judgment, his petition is arguably moot because the state court granted him the relief he requested and entered a new judgment of conviction after resentencing. *Keefe v. Kirkegard*, No. CV 17-15-GF-

BMM-JTJ, 2018 WL 5795518, at *1 (D. Mont. Aug. 22, 2018) ("Keefe has been granted the relief requested pursuant to the 1986 judgment of conviction; he will [be] resentenced. Accordingly, the pending petition should be dismissed as moot"); *Jensen v. Clements*, No. 11-C-803, 2017 WL 5712690, at *7 (E.D. Wis. Nov. 27, 2017) ("The judgment of conviction resulting from that renewed prosecution is the one now before the court, meaning that any remaining objections to Jensen's previous judgment of conviction are moot"); *Chavez v. Adams*, No. CV 16-08696-GW (JDE), 2017 WL 7101157, at *2 (C.D. Cal. Nov. 9, 2017) ("The Petitioner is not 'in custody pursuant to the judgment' which she is challenging; rather, she is in custody pursuant to a new judgment. As a result, the current Petition is moot").

Nevertheless, because Petitioner now seeks further relief in addition to the relief he obtained after filing a state court petition for postconviction relief, because the State concedes that Petitioner exhausted his *Brady* claim on direct appeal, and because the federal petition could be construed as a challenge to the new judgment, consideration of the merits of the *Brady* claim is appropriate. *See Keefe*, 2018 WL 5795518, at *1 ("Because a new judgment will issue following Keefe's resentencing . . . he will not be precluded, at some future date, from potentially filing a federal habeas petition challenging the new judgment").

**C.     *Brady* Claim**

Petitioner argues he is entitled to a new trial because the State suppressed the iPhone evidence. While there is no general right to discovery in a criminal case, the suppression of evidence favorable to the defendant violates due process "where the evidence is material

13

either to guilt or punishment," *Brady v. Maryland*, 373 U.S. 83, 87 (1963), including impeachment evidence of key government witnesses. *Giglio v. United States*, 405 U.S. 150, 154 (1972). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

The state court concluded the iPhone call log evidence was favorable to Petitioner but after considering the materiality of the evidence, determined that would not have resulted in a different outcome. "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70 (2009) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985). In other words, a defendant is prejudiced by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

The state court's conclusion—that Petitioner did not establish a reasonable likelihood of a different result had the evidence been disclosed—is supportable. If the iPhone call history was introduced to support Petitioner's alternate suspect theory or to attempt to undermine Agent Gagnon's credibility given Agent Gagnon's testimony about the July 29 phone call, one can reasonably conclude the prosecution would have responded

with the evidence of the second phone, which minimizes the probative value and impeachment value of the iPhone evidence.

In support of his argument in state court (Defendant's Rebuttal Argument at 2-3, ECF No. 11 at 95-96.), Petitioner cited *Smith v. Cain*, 565 U.S. 73 (2012), in which the Supreme Court noted that "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict," but concluded that was not the situation it faced in that case because the testimony impeached by the withheld evidence "was the *only* evidence linking [the defendant] to the crime." *Id.* at 76 (emphasis in original). The Supreme Court declined "to speculate about which of [the witness's] contradictory declarations the jury would have believed," and was unpersuaded by the state's arguments suggesting the jury would have still believed the witness's trial testimony: "the State's argument offers a reason that the jury *could* have disbelieved [the witness's] undisclosed statements, but gives us no confidence that it *would* have done so." *Id.* (emphasis in original).

Petitioner's argument is unpersuasive, however, because *Smith* is distinguishable. Agent Gagnon's testimony, including the testimony about the July 29 phone call, was undoubtedly central to the State's case, but it was not the only evidence for the jury to consider in weighing the competing narratives. Another agent also testified at trial and that agent's testimony contradicted key elements of Petitioner's version, including Petitioner's assertion about a strip search and the lack of Miranda warnings. (See Trial Transcript Vol. I at 121–24.) Because the iPhone evidence would only marginally impact Agent Gagnon's testimony, and because the iPhone evidence in no way undermines the other agent's

15

testimony, the state court here was not left in a position, as the state court was in *Smith*, to speculate about which narrative the jury would have believed.

Even if the evidence was material, Petitioner cannot prevail on his *Brady* claim. There appears to be no dispute regarding Petitioner's knowledge of the existence of the iPhone or the fact that Agent Gagnon seized the iPhone. While the physical iPhone was evidently inadvertently withheld, the relevant evidence here is the call log. That call log evidence was arguably not "suppressed" or "withheld" by the State for purposes of a *Brady* violation because Petitioner was in the best position to know whether his locked iPhone received any calls from Goodwin on July 29th and because there was no evidence of any other impediment to Petitioner obtaining the call history through other means, including through his service provider. *See United States v. Cruz-Feliciano*, 786 F.3d 78, 87 (1st Cir. 2015) ("With regard to the first prong, we do not consider favorable evidence suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence") (internal quotation omitted); *United States v. Pandozzi*, 878 F.2d 1526, 1529 (1st Cir. 1989) ("*Brady* does not require the government to turn over information which, 'with any reasonable diligence, the defendant can obtain himself'") (internal quotation omitted); *Boss v. Pierce*, 263 F.3d 734, 743 (7th Cir. 2001) ("Refusing to characterize as *Brady* material information the defense can be expected to discover serves to weed out incredible claims of ignorance, to prevent sandbagging, and is consistent with a focus on actual knowledge").

Because the state court supportably determined that the iPhone call history was not material evidence, and because Petitioner did not establish that the iPhone call history was

unknown or unavailable to Petitioner before trial, the state court's decision was not contrary to or an unreasonable application of *Brady* and its progeny.

## CONCLUSION

Based on the foregoing analysis, an evidentiary hearing is not warranted under Rule 8 of the Rules Governing Section 2254 Cases. I recommend the Court dismiss Petitioner's petition for habeas relief under 28 U.S.C. § 2254, and that the Court deny a certificate of appealability pursuant to Rule 11 of the Rules Governing Section 2254 Cases because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

## **NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 14th day of October, 2020.